# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| MARCELA LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cv-00245 |
| | ) | Judge Aleta A. Trauger |
| WILLIAMSON COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff Marcela Lopez, previously employed by defendant Williamson County, Tennessee ("the County"), filed this lawsuit asserting claims for disability discrimination in violation of the Americans with Disabilities Act ("ADA") and the Tennessee Disability Act ("TDA"), discrimination on the basis of ethnic origin and race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and breach of an employment contract under Tennessee law. (Compl., Doc. No. 1.)[1] Now before the court are the County's Motion for Summary Judgment (Doc. No. 29) and Lopez's Motion for Partial Summary Judgment (Doc. No. 26) as to her breach of contract claim only.

As set forth herein, the court finds that the material facts are undisputed and that the defendant is entitled to judgment as a matter of law on all outstanding claims set forth in the Complaint. Accordingly, the defendant's motion will be granted in its entirety, and the plaintiff's motion will be denied.

---

[1] The parties settled and the court approved the dismissal of an additional claim under the Fair Labor Standards Act. (*See* Doc. Nos. 1, 23–25.)

## I.       STANDARD OF REVIEW – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S.

at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

Finally, the standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

At the same time, however, a defendant seeking summary judgment only needs to show that the plaintiff lacks sufficient evidence to prove a single element of a particular claim in order for the defendant to be entitled to summary judgment on that claim. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) ("As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of Plaintiff's claim."). Conversely, when a plaintiff moves for summary judgment on her own claims, for which she carries the burden of proof and persuasion at trial, she faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). She must show the absence of a material factual dispute on all of the essential elements of her claim. *See Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) ("In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's 'initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting *Cockrel*,

270 F.3d at 105)). Summary judgment in favor of the party with the burden of proof "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

In light of this standard, if the defendant establishes that it is entitled to summary judgment on a particular claim, then a plaintiff's cross-motion on the same claim must automatically be denied. *Accord, e.g.*, *Zammit v. Shire US, Inc.,* 415 F. Supp. 2d 760, 769 n.8 (E.D. Mich. 2006) ("Given the Court's ruling that Defendant is entitled to summary judgment in its favor . . . , it readily follows that Plaintiff's cross-motion for summary judgment must be denied.").

## II.    THE DEFENDANT'S MOTION

### A.    Facts[2] and Procedural History

Lopez began working for the County in 2019 as a scales operator at the Williamson County Solid Waste Department (the "department"). She was promoted to the position of Administrative Support III approximately six months later. (Lopez Dep. 54.[3]) She was terminated on June 13, 2023. This lawsuit is about that termination and the events leading up to it.

Due to a serious medical condition requiring surgery, Lopez requested and was granted leave under the Family and Medical Leave Act ("FMLA") in December 2022, with an initial "anticipated return date" of February 21, 2023. (Kennedy Jan. 5, 2023 letter, Doc. No. 33-4, at 52.)

---

[2] The facts for which no citation is provided are drawn directly from Plaintiff's Response to Defendant's Statement of Undisputed Facts ("PRSUF") (Doc. No. 43) and are undisputed for purposes of the defendant's Motion for Summary Judgment. All facts set forth herein are undisputed for purposes of the defendant's motion unless otherwise indicated.

[3] The plaintiff filed excerpts from her deposition (Doc. No. 27-2), and both the plaintiff and the defendant then filed the complete transcript of her deposition, spread over numerous documents (Doc. Nos. 33-1 through 33-5, 42-2 through 42-5). Similarly, the plaintiff filed excerpts from the deposition of Clair Cochran (Doc. No. 27-3), and then both parties filed the complete Cochran transcript with exhibits, again spread out over multiple filings (Doc. Nos. 32-1, 42-6 through 46-8). For ease of reference, the court will cite both of these depositions using the original pagination of the transcripts as provided by the court reporter.

In the letter confirming the approval of FMLA leave, a representative of the Williamson County Human Resources ("HR") Department also directed the plaintiff to "keep [her] supervisor informed of the status of [her] condition and any change of expected date of [her] return to duty." (*Id.*)[4]

The plaintiff was not able to return to work on February 21, 2023, but Williamson County approved Lopez's requests to extend her FMLA leave until it was exhausted on March 26, 2023.[5] In a letter dated March 7, 2023, an HR notified Lopez that any leave after March 26, 2023 would need to be coordinated through, and approved by, department director Mac Nolen. The same letter reminded Lopez to keep her supervisor informed of the status of her condition and any change in her expected date of return. As of March 7, 2023, Lopez's expected date of return was noted to be April 1, 2023. (Doc. No. 33-5 at 20; *see also* Lopez Dep. 112.)

Lopez was not able to return to work on April 1, 2023, but, following the exhaustion of her FMLA leave, Williamson County granted Lopez's request to extend her non-FMLA leave,[6] first

---

[4] The County explains that the plaintiff received various benefits while on leave that were separate from the protected leave benefit afforded by the FMLA. Specifically, the County makes Temporary Disability Benefits ("TDBs") available to all full-time employees who experience a qualifying event, for a period of six months following the date of the qualifying event. The plaintiff participated in this benefit and received TBD payments through this program through June 9, 2023. (*See* Doc. No. 32-3, Cochran Aff. ¶¶ 2–3.) In addition to TBDs, Lopez opted to purchase both short-term and long-term disability plans offered by Williamson County that are administered by the insurance company, not the County. (*Id.* ¶ 4.)

The County also explains that, because Lopez was applying for FMLA Leave and TDBs for the same period of absence, the TDB Application was accepted as proof of medical necessity for both FMLA leave and TDBs, to reduce the amount of documentation required from Lopez. (*See* Cochran Dep. 25–26.)

[5] The County explains that the plaintiff's FMLA leave actually terminated two weeks prior to March 26, 2023, on March 12, but that the plaintiff was given an additional two weeks, or fourteen weeks total, due to "a mathematical error in calculating hours." (Cochran Dep. 103.)

[6] For reasons that are not clear, the plaintiff purports to dispute this statement. Her objection and her citations to the record are not responsive to the statement and do not serve to refute it. (*See* PRSUF ¶ 6.) Regardless, it is clear from the record that the plaintiff was not able to return to work

from March 31, 2023 through May 15, 2023, and then from May 15, 2023 through June 12, 2023. (Lopez Dep. 133–35; Lopez Dep. Exs. 23–24, Doc. No. 33-5 at 22–26.) Before her FMLA leave expired, Lopez spoke by telephone with Clair Cochran, the County's HR Director, regarding the possibility of continued leave following the expiration of her FMLA leave. (Lopez Dep. 113–14.)

Lopez understood that it was her responsibility to keep her supervisor and the HR office informed of her condition and when she would be able to return to work. (Lopez Dep. 94.) The Personnel Policies for Williamson County Government expressly require that any request for FMLA leave due to an employee's serious medical condition be supported by a "certification" filled out by the employee's medical provider on a form provided by the County. (Personnel Policies § 4.06, Doc. No. 32-3 at 179.) "The certification must include the date the serious health condition began, [and] how long the condition is expected to continue[.]" (*Id.*) In addition to submitting this certification, the employee on leave "is required to report in periodically to his/her supervisor while on FMLA leave. The employee shall report in weekly, or . . . as frequently as is possible given the employee's medical condition. The employee is expected to indicate whether he or she intends to return to work." (*Id.*)

On May 11, 2023, Lopez submitted a note from her treating physician stating that she needed to be excused from work "for 5/15/23–6/12/23." (Lopez Dep. Ex. 24, Doc. No. 33-5 at 26; Lopez Dep. 134.) On May 12, Lopez texted the director of her department, Mac Nolen, to inform him that her "new projected return date [was] June 12th." (Doc. No. 33-5 at 31.)

On May 24, 2023, Patti Hawkins, an employee in the County's Benefits Department, sent a letter to Lopez (the "May 24 letter") referencing the latest physician statement as "indicat[ing]

---

on April 1 and that her requests to extend her non-FMLA leave were granted, at least through June 12, 2023, as discussed below.

that [Lopez's] return to work date will be June 12, 2023." (Lopez Dep. Ex. 25, Doc. No. 33-5 at 27.) The purpose of Hawkins' letter was to notify the plaintiff as follows:

> Please be advised that since you exhausted your FMLA leave on March 26, 2023 and your Temporary Disability Program [wil]l end on June 10, 2023, you will be on uncompensated leave. For this reason you will be offered continuation of benefits through COBRA as of June 11, 2023.

(*Id.*)

On June 2, 2023,[7] Lopez returned to her doctor for an appointment and, at the same time, dropped off another leave certification form for her doctor to complete. (Lopez Dep. 143, 155, 186–87.) She apparently also emailed the form to her doctor's office on June 2, 2023. (*See* Doc. No. 45-1 at 2–7.) During her appointment on June 2, 2023, Lopez and her provider discussed the fact that she still "needed to heal" from her prior surgeries and would need another surgery in the fall. (*Id.* at 143.) The plaintiff testified that her doctor told her she could go back to work and that the doctor could sign a paper requesting accommodations. However, the doctor did not sign any request for accommodations. Instead, "[i]n the meantime," the doctor indicated that she would give Lopez additional time to heal, because she was still "bleeding a lot" and "leaking and all that stuff," so her doctor wanted her to "stay out of work till August 11th," with the hope that she could perhaps go back to work after August 11, 2023 with accommodations. (*Id.* at 144.) Asked to clarify whether her doctor indicated that she could go back to work immediately with accommodations or after August 11, 2023 with accommodations, Lopez insisted that her doctor told her she could go back to work immediately with accommodations. (*Id.* at 145.) She added, "[a]nd she gave me that

---

[7] In an affidavit, Lopez states that she signed the letter during a doctor's appointment on June 6, 2023 (Doc. No. 27-1, Lopez Aff. ¶ 8), even though her signature on the form is dated June 2, 2023 (Doc. No. 33-5 at 33), and her medical records show that this appointment occurred on June 2, 2023 (Doc. No. 32-5 at 2). Lopez's assertion in an affidavit is not sufficient to create an issue of fact; even if it were, whether the visit occurred on June 2, 2023 or June 6, 2023 is not a material fact.

piece of paper." (*Id.*) "[T]hat piece of paper," however, is the certification form her doctor completed indicating that Lopez was "totally disabled and unable to work" "[f]rom 12/05/2022 [t]hru 8-11-2023" and would "need another surgery at the end of the year." (Doc. No. 33-5 at 33.) Lopez's medical treatment notes for that encounter state, in relevant part, that Lopez was "scared to go back to work due to her issues, wants to extend fmla" and that she was "on long term disability for work at this time due to ongoing surgical complication . . . and plans to stay on this through the next surgery. Paperwork will need to be filled again to extend [leave] through August." (Doc. No. 32-5 at 2–3.) The plaintiff agreed that she asked her physician to keep her off work until August 11 because she felt that she needed more time to heal. (Lopez Dep. 146.) And then she contradicted herself, stating that her physician's treatment note was "wrong." (*Id.* at 147.) Lopez testified that she wanted to go back to work right away with accommodations. (*Id.*) However, she also conceded that she never told the County that she could return to work with accommodations. (*Id.* at 148–49.) The plaintiff claims she was not given the chance to ask for accommodations and that the County never asked her if she needed accommodations. (*Id.* 152, 154.)

The doctor's office did not return the completed form to Lopez indicating that she needed leave through at least August 11, 2023 until 12:15 p.m. on June 13, 2023. (*See* Doc. No. 45-1 at 13–14), shortly after she was terminated. Regardless, between her doctor's visit on June 2 and her termination on June 13, 2023, Lopez did not talk to anyone in the Benefits Department or HR, to her director Mac Nolen, or to her direct supervisor, Janine (Lehrer) Sullivan. (Lopez Dep. 155–56.)

Moreover, while there was some confusion about whether the plaintiff's expected return to work date was June 12, 2023 (as she told Nolen and as stated in Hawkins' letter), or June 13, 2023 (as indicated by the doctor's certification that she needed leave through June 12), it is undisputed

that the plaintiff did not return to work on June 12, 2023 or June 13, 2023. (Lopez Dep. 189.)

Instead, on June 13, 2023, HR Director Clair Cochran called the plaintiff "right before lunch," initially leaving a voice message. The recording of the voice message was played during the plaintiff's deposition and transcribed by the court reporter. In that message, Cochran stated:

> Hey, Marcela. This is Clair Cochran with Williamson County. Just wanted to touch base with you. Please give us a call back. We haven't heard from you, and we're in a position now we're going to have to make a decision going forward. Just wanted to communicate that to you today.
>
> So let's have a conversation via phone. . . .You may reach me at (615) 591-8529 . . . . Once again, Clair Cochran with Williamson County. Look forward to talking with you. Bye-bye.

(*Id.* at 160.)

Lopez called Cochran back shortly after receiving the message. The plaintiff's husband recorded that telephone conversation (unbeknownst to Cochran), and Lopez later produced the recording in discovery. The audio files (three separate files) were made an exhibit to Lopez's deposition, and they were played during the deposition and transcribed in their entirety as part of the plaintiff's deposition transcript. The defendant also submitted them as a collective exhibit in support of its Motion for Summary Judgment. (Doc. No. 34.) The conversation, in relevant part, went as follows:

> MS. COCHRAN: This is Clair. May I help you?
>
> MS. LOPEZ: Hey, Clair. This is Marcela Lopez. I missed your call earlier today .
>
> MS. COCHRAN: Hey. Yes, hey, how are you?
>
> MS. LOPEZ : Oh, I'm hanging in there. Not very well, as you can see. Well, you know, of course.
>
> MS. COCHRAN: Yeah. Yes, I kind of gathered when we didn't hear from you things aren't progressing in the right trajectory as fast as we'd want them. But I wanted to . . . you know, follow up and you let you know that unfortunately we're going to have to move forward in posting your position. But you are eligible for, you know, rehire when you hopefully can recover and return back to work. But

we've just extended the leave, you know, way beyond FMLA coverage, which is appropriate, and tried to work with you.

And right now, it's essential to the operations—and I'm sure you can understand that—to, you know, have the position filled. So I wanted to alert you to that, Marcela, and at least give you the opportunity to tell me if there's anything that's imminent as far as changing. Because, you know, we didn't hear back from you on the day that you were—you know, listed you were going to return from your physician.

MS. LOPEZ: Okay. Come back again. Come back. Pardon?

MS. COCHRAN: Well, you were supposed to return on Monday. And that was the documentation that we have on file. . . . Because we weren't told otherwise that you were going to extend that. Was there some paperwork that you'd sent in that we didn't—unfortunately didn't receive maybe?

MS. LOPEZ: Yes. I was in talks with my doctor on Friday.

MS. COCHRAN: Uh-huh.

MS. LOPEZ : And her—the entire team. So we were in talks. And they're debating of when the date of the next surgery that's going to—you know, it's going to happen in the fall. I'm not in no condition to return to work at this moment—

MS. COCHRAN: Right.

MS. LOPEZ: —as you can see. But I do have paperwork. And when you say "we," what do you mean we? You said that things aren't—

MS. COCHRAN: We as a company. You know, we as your employer and, of course, as your HR department. So, you know, Oksana [Kennedy], myself, others, we work on receiving the paperwork. So your supervisor didn't receive an extension. Oksana didn't receive an extension. But I'm glad to hear that you sent that in. But you just mentioned that you had another surgery coming up in the fall and that you're not able to return to work at this time.

And I'm—I hate to deliver the tough news, but we aren't in a position where we can continue to hold this position open. You've already exhausted your family medical leave protection. And we've extended that way beyond that period of time, which is 12 weeks. And so we are way beyond 12 weeks at this point.

MS. LOPEZ: Yes, correct. But I've been in contact with Mac [Nolen] the entire time and with Janine [(Lehrer) Sullivan]. The paperwork is there. I just—

MS. COCHRAN: [unintelligible] I understand. I talked to Mac last night. But he too had not received any information. He expected you to return yesterday.

MS. LOPEZ: Right.

MS. COCHRAN: And had not heard anything back. So, you know, right now, there's not anything that's imminent as far as an improvement, Marcela. And so unless there's something that is imminent, we can't extend the leave any further. That's just not a practice that we have.

(*Id.* at 166–70.)

At this point, Lopez's husband interjected, and Lopez and her husband together explained that Lopez had just received her physician assessment back. (*Id.* at 170 ("I just got it from the doctor.").) Both Lopez and her husband became angry and accused the County (and Cochran) of "harassment" and cited delays in the short-term disability payments. (*Id.* at 171–72.) The conversation proceeded, with Cochran again explaining that Lopez's FMLA leave ended as of March 26, 2023 and that the County was not able to further extend her leave, though Lopez remained "eligible to reapply." (*Id.* at 176; *see id.* at 179.) Cochran eventually terminated the very contentious conversation.[8]

Later that day, around 2:00 p.m., Lopez forwarded her physician's assessment, indicating that she was "totally disabled and unable to work" "[f]rom 12/05/2022 [t]hru 8-11-2023" and would "need another surgery at the end of the year," to Patricia Hawkins, Oksana Kennedy, and Gina Crawford. (*Id.* at 186; *see also* Doc. No. 33-5 at 32–33; Doc. No. 45-1 at 8–9.) Kennedy forwarded it to Cochran. (Doc. No. 33-5 at 32.) The County considered that the plaintiff had by that time already been terminated and that the physician's assessment did not change the situation, particularly because the plaintiff did actually request an extension of her leave. (Cochran Dep. 109.)

---

[8] After her termination, the plaintiff continued to receive long-term disability insurance payments. (Lopez Dep. 190.)

The defendant submitted the Affidavit of Janine (Lehrer) Sullivan, the plaintiff's direct supervisor during her employment with the department. Sullivan is Administrative Manager for the department. (Doc. No. 32-2, Sullivan Aff. ¶ 1.) According to Sullivan, Lopez's job at the time she took leave was Administrative Support III, and there was only one Administrative Support III position in the department. (*Id.* ¶ 2.) Lopez's duties primarily consisted of providing administrative support to assist Sullivan, though she also operated the scales every other Saturday and sometimes during the week when the regular scales operator was not available. (*Id.*) While Lopez was on leave, Sullivan was required to perform her own duties as well as those of Lopez, including working the scales every other Saturday, which put a "strain on [Sullivan] and on the Department," making it difficult for Sullivan to focus on her own tasks or to take any time off and requiring her to take frequent overtime. (*Id.* ¶¶ 6–7.) Although the County hired a part-time employee to cover Lopez's Saturday shifts a few months into Lopez's leave, Sullivan continued to operate under the strain of performing two jobs during Lopez's absence. (*Id.* ¶ 7.) "As [Lopez's] leave extended, the burden on [Sullivan] and the Department increased to the point that it was no longer tenable to continue without someone serving in the administrative support role." (*Id.*)

As the plaintiff herself points out, she had a history of failing to timely update the County as to needed extensions of her leave and her expected return to work date, which the County repeatedly overlooked, allowing retroactive extensions of her leave. For example, on March 6, 2023, a Williamson County Benefits Clerk notified Lopez that she had submitted a physician certification stating that she would be "returning to work on 2/20/23" and a subsequent certification stating she would be out "3/8/23 thru 3/31/23," so she needed to provide documentation for the "gap between 2/20 and 3/8." (Doc. No. 33-5 at 16.) Similarly, although her physician certified that she needed to be out through March 31, 2023, the plaintiff did not return

to work on April 1 and, instead, contacted HR on April 7 to inform the office that an additional surgery had been scheduled for April 10; on April 12, she submitted a certification dated April 7, 2023 stating that she needed additional leave from March 31, 2023 through May 15, 2023. (*See* Doc. No. 33-5 at 20–24.)

Based on that history and the May 24 letter advising her that, when her short term disability ended on June 10, 2023, she would begin "uncompensated leave" status (Doc. No. 33-5 at 27), the plaintiff insists that she believed "that she was protected and had entered uncompensated leave as of June 11, 2025." (Lopez Dep. 174; *see also* Doc. No. 27-1, Lopez Aff. ¶ 6 ("When I received the letter on May 24, 2023, I believed that Mac Nolen was holding my job for me by providing uncompensated leave until my medical situation allowed me to return.").) She also contends that her doctor's last assessment was "forwarded to Williamson County by her doctor on June 6th" (PRSUF ¶ 16), but the record citations in support of that assertion do not support it (*see* Lopez Dep. 142–143, 168-169, 186; Ex. 27, Doc. No. 33-5 at 32), and it is contradicted elsewhere in the record, as set forth above (*see, e.g.*, Lopez Dep. 168–70 & Doc. No. 33-5 at 32; *see also* Doc. No. 45-1 at 13–14, 8–9 (indicating that the plaintiff received the form from her doctor's office by email on June 13, 2023 and forwarded it to Patti Hawkins the same day)).

As of the date of her deposition, the plaintiff continued to receive long-term disability insurance payments. (Lopez Dep. 190.) She testified that, to continue receiving these benefits, her physician must periodically certify to the insurance company that it is necessary for her to be off work because of her medical condition. (*Id.*) Lopez applied for Social Security disability benefits in January 2024. (Doc. No. 32-4 at 36.) No additional information regarding approval or disapproval of her application is in the record.

In any event, after her termination, the plaintiff filed a charge of discrimination with the EEOC. (Lopez Dep. 205.) She was not represented by counsel at the time. (*Id.* at 205–06.) The narrative in support of her claims states:

> The above-named employer hired me on September 02, 2020, as an Administrator Support. The above-named employer employs more than 20 employees.
>
> I am a person with a disability. As a result, in December 2022, I requested and was granted time off. I was granted FMLA, Short-term and long-term disability benefits. I [sic] May 2023, I received a letter from Respondent reminding me that my current physician statement indicates my return-to-work date will be June 12, 2023. In the letter I also was reminded that my FMLA exhausted on March 26, 2023, and my temporary disability program will end on June 10, 2023, on uncompensated leave. Due to needing another surgery at the end of the year (December 2023) my doctor placed me out of work thru August 11, 2023.
>
> I believe I have been discriminated and retaliated against because of my disability, in violation of the Americans with Disabilities Act Amendments Act of 2008 and because of my race (Hispanic) and religion, in violation of Title VII of the Civil Right Act of 1964, as amended and because of my age (48), in violation of the Age Discrimination in employment Act of 1967, as amended.

(Doc. No. 33-5 at 37–38.)

The plaintiff testified that she believed she was replaced by a less qualified person, but she also agreed that she did not know what that person's experience was. (Lopez Dep. 212.)

She also identified several White, male County employees who were off work for medical reasons and who, she believed, were allowed to take more than six months' leave without being terminated. (*Id.* at 213–16.) She conceded that she could not specifically state the length of their leaves or the specific circumstances under which they took leave. (*Id.* at 215.) She also did not know whether any of these individuals took extended leave after Cochran became HR Director, because she did not know what date Cochran took that position. (*Id.* at 216.)

According to the County, the personnel records for each of the individuals identified by Lopez during her deposition indicate that none of them took extended medical leave after the expiration of FMLA leave for anywhere near six months, and most of them did not take FMLA

leave at all, instead taking time off accrued pursuant to Williamson County sick and vacation leave policies. (*See* Cochran Aff. ¶¶ 12–19.) Only one of the employees identified by the plaintiff took additional leave after the expiration of his twelve weeks (480 hours) of FMLA leave, for a total of one week (40 hours). (*Id.* ¶ 14.) Moreover, the County employs "several truck drivers and heavy equipment operators, so if employees in those positions needed leave, the work can be distributed amongst multiple other employees." (Sullivan Aff. ¶ 8.) This was not true of Lopez's position, as there was only one Administrative Support III position. (*Id.*)

After receiving her Determination and Notice of Rights from the EEOC on December 20, 2023 (Doc. No. 1-1), the plaintiff filed this lawsuit on March 4, 2024. As now relevant, she asserts discrimination claims under federal and state law, and a state law breach of contract claim. The defendant seeks summary judgment on all of these claims. The defendant filed a Memorandum in support of its motion (Doc. No. 30), a Statement of Undisputed Material Facts (Doc. No. 31), and, as indicated above, a substantial quantity of evidentiary material to support its factual statements. The plaintiff filed a Response in opposition to the defendant's motion (Doc. No. 42), her Response to the Statement of Facts (Doc. No. 43), and additional (and often duplicative) evidentiary material. The defendant filed a Reply in further support of its motion. (Doc. No. 48.)

### B. Discussion

#### 1. ADA Claims

In her Complaint, Lopez alleges that the County violated the ADA when it (1) failed to reasonably accommodate her disability by offering or providing more bathroom breaks and allowing her to work "with her catheter or while wearing diapers" (Compl. ¶¶ 45–46) and (2) when it terminated her because of her disability or perceived disability (*id.* ¶ 47). The County moves for summary judgment on both of these claims. In her Response, the plaintiff pivots, abandoning her failure to accommodate claim based on the County's failure to offer additional bathroom breaks

and arguing instead that she requested and was denied the "reasonable accommodation of time off of work to recover from her surgery." (Doc. No. 42 at 11.)[9]

### a) ADA Failure to Accommodate

The plaintiff testified during her deposition that she did not request an accommodation in the form of additional bathroom breaks or permission to wear adult diapers, and she does not argue now that she could have returned to work in June 2023, even with such accommodations. The court therefore finds, without need for further discussion, that the defendant is entitled to summary judgment on the plaintiff's claim that the County failed to accommodate her by providing additional bathroom breaks or allowing her to wear adult diapers. The plaintiff argues now that she should have been accorded additional unpaid leave as an accommodation for her disability.

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA broadly defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A); *see also Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 415 (6th Cir. 2020).

---

[9] Lopez also argues that the defendant violated the ADA separately by improperly conducting a "medical examination" or "disability inquiry" prohibited under 42 U.S.C. § 12112(d)(4), beyond what was authorized by the FMLA. (*See* Doc. No. 42 at 5–7.) However, she did not plead an FMLA claim or any claim for improper disability inquiry, and she is barred from bringing a new legal claim in response to a summary judgment motion. *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing *Tucker v. Union of Needletrades, Indus. and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)). Regardless, the FMLA permits employers to require requests for leave to be "supported by a certification issued by the health care provider of the eligible employee," 29 U.S.C. § 2613(a), and the plaintiff offers to evidence suggesting that the information requested on the County's certification forms required more information than that permitted by 29 U.S.C. § 2613(b).

Because failure to accommodate is listed in the ADA's definition of disability discrimination, "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination. . . . [I]f the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." *Fisher*, 951 F.3d at 416 (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007)).

> Under the direct-evidence framework, the plaintiff must show that
>
> (1) she was disabled within the meaning of the ADA, (2) she was otherwise qualified for her position . . . ; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation.

*Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 669 (6th Cir. 2020) (citing *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018)). In this case, there is no dispute, for purposes of the defendant's motion, that the plaintiff was disabled and that the defendant knew about her disability.

To be "otherwise qualified," a plaintiff must be able to perform her job "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). The plaintiff bears the initial burden of showing "that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Fisher*, 951 F.3d at 419 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). "The defendant then must show either 'special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances,' or that the proposed accommodation eliminates an essential job requirement." *Id.* (first quoting *U.S. Airways*, 535 U.S. at 402; then citing *Kleiber*, 485 F.3d at 869). The defendant bears the burden of "proving that a challenged job criterion is essential, and

therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" it. *Id.* at 417 (quoting *Kleiber*, 485 F.3d at 869). Generally, whether a proposed accommodation is reasonable is a question of fact. *Id.* at 419 (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)).

Williamson County argues that (1) prior to her termination, Lopez did not request any accommodation other than leave through June 12, 2023, which was granted; (2) the plaintiff was not "otherwise qualified" for her job, because her doctor's certification established that she was "totally disabled and unable to work" through August 11, 2023, and, even if the plaintiff had submitted her doctor's certification prior to her termination, continued medical leave under the circumstances was not a reasonable accommodation. In addition, Williamson County argues that extending the plaintiff's leave further would have imposed an undue hardship.

The plaintiff correctly articulates the law concerning medical leave as a reasonable accommodation, and she argues that medical leave in her case was a reasonable accommodation because "Williamson County provided paid disability leave for up to six months. Williamson County provides uncompensated leave of up to 12 months upon the approval of the Department Head. Ms. Lopez was approved for both of these leaves, the[n] discharged." (Doc. No. 42 at 13 (citing Williamson County Personnel Policies § 4.05, Doc. No. 32-1 at 177).)

In the Sixth Circuit, "'medical leave can constitute a reasonable accommodation' under certain circumstances." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 561 (6th Cir. 2022) (quoting *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017)). Likewise, "an inability to work while on such leave does not mean that an individual is automatically unqualified." *Id.* at 562 (quoting *Terre v. Hopson*, 708 F. App'x 221, 228–29 (6th Cir. 2017)). In assessing the reasonableness of a request for extended leave as an accommodation,

the court must consider "(1) the amount of leave sought; (2) whether the requested leave generally complies with the employer's leave policies; and (3) the nature of the employee's prognosis, treatment, and likelihood of recovery." *Id.* (citations omitted). Generally, however, "when the requested accommodation has no reasonable prospect of allowing the individual to work in the identifiable future, it is objectively not an accommodation that the employer should be required to provide." *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000). Thus, when the employer has "already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation." *Id.*; *see also Caldwell v. MGM Grand Detroit, LLC*, No. 23-1436, 2024 WL 2182406, at *3 (6th Cir. Jan. 5, 2024) ("[A]dditional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated 'no clear prospects for recovery.'" (quoting *Williams*, 847 F.3d at 394)).

Under this standard, the plaintiff's request for additional leave as an accommodation was objectively unreasonable. First, there is no dispute in this case that, during their June 13, 2023 telephone call, Cochran gave Lopez the opportunity to tell her if circumstances had changed or were expected to change imminently. (*See* Lopez Dep. at 167 ("So I wanted to alert you to that, Marcela, and at least give you the opportunity to tell me if there's anything that's imminent as far as changing.").) In response, Lopez indicated only that she had spoken with her doctor, that she was in no condition to return to work at that moment, and that she was going to need another surgery sometime in the fall. (*Id.* at 168.) Given that information, Cochran told Lopez that the County could not continue to hold her position open. (*Id.*) Lopez's response to the news that she was being terminated indicated that she had expected her job to be held open indefinitely. (*Id.* at 169.) Cochran, however, explained that "unless" there was "anything that's imminent as far as an

improvement," the County could not extend Lopez's leave any further. (*Id.* at 170.) Lopez's reaction to this news could be reasonably interpreted as a request for additional indefinite leave. She did not, at that time, request leave through a specific date or indicate that she would definitely be able to return to work—with or without other accommodations—at any time in the foreseeable future. And she had not, as of the time of the telephone call, returned her doctor's updated form stating that she needed to be off work at least through August 11, 2023. As of the time she was terminated, that is, Lopez had only vaguely indicated that she needed additional leave for an indeterminate period of time. Her request for additional leave of indefinite duration, with an additional surgery to be scheduled sometime in the fall, was objectively unreasonable.

Moreover, even if the court assumes, as the plaintiff claims (with no evidentiary support), that she returned her updated medical certification to the County on June 6, 2023, the analysis does not change. With respect to the length of the leave requested, the plaintiff had already received six months of leave and was requesting an additional two months, at least. Eight months leave, although less than a year, is a substantial period of time.

As for whether "the requested leave generally complies with the employer's leave policies," *King*, 30 F.4th at 561, the Personnel Policies section of the employee manual to which the plaintiff refers (titled "Leave of Absence") states only that, "[a]fter consultation with Human Resources, the Department Head *may allow additional [medical] leave to that which the law requires*." (Doc. No. 32-1 at 177.) The policy indicates that a department head may, in his or her discretion, allow a leave of absence of a maximum of twelve months. (*Id.*) In addition, "[a]ll personal [leaves of absence] are at the discretion of each Department Head and are not the right of any employee." (*Id.*) However, although her department head had the discretion to approve additional leave under this policy, as discussed in greater detail below, there is no evidence that

any other employee in the plaintiff's department had ever requested or received the amount of leave the plaintiff had already taken.

Third, and most importantly, even though the last medical certification indicated that the plaintiff needed to be off work through August 11, 2023, there was no guarantee that the plaintiff would actually be able to return to work on that date. Rather, she had another surgery yet to be scheduled, and she had already requested numerous extensions of her leave date. As of June 13, 2023, the plaintiff had no clear prospect of recovery by August 11, 2023. Again, "[a]dditional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated 'no clear prospects for recovery.'" *Caldwell*, 2024 WL 2182406, at *3 (quoting *Williams*, 847 F.3d at 394); *see also Cooley v. E. Tenn. Hum. Res. Agency, Inc.*, 720 F. App'x 734, 741 (6th Cir. 2017) ("'[T]he relevant inquiry is whether [the employee] showed [her employer] a certain or credibly proven end to the leave." A 'vague estimate' of the date that an employee can return to her job is insufficient." (first quoting *Maat v. Cty. of Ottawa*, 657 F. App'x 404, 413 (6th Cir. 2016); and then citing *Walsh*, 201 F.3d at 727)).

Because the plaintiff's request for additional leave as an accommodation was objectively unreasonable under the specific factual circumstances presented here, the plaintiff's FMLA claim for failure to accommodate fails as a matter of law.

Moreover, even if there were some question as to the reasonableness of the request, the County has established that additional leave would have posed an undue hardship on it. As the County argues, Lopez was the only employee in the Administrative Support III position in her department. (Sullivan Aff. ¶ 2.) The plaintiff acknowledges that in-person attendance is required for that job. (Doc. No. 42 at 11 ("Ms. Lopez acknowledges that attendance is important in her job.").) During Lopez's absence, her direct supervisor was required to perform her own job and

the plaintiff's duties as well, putting a significant strain on the department and Sullivan, requiring her to work overtime and making it difficult for her to schedule any time off work. (Sullivan Aff. ¶¶ 6–8.) The plaintiff contends only that the Personnel Policies allowed for uncompensated leave of up to twelve months and that her department head "approved additional leave after March 26th and told Ms. Lopez her job was safe." (Doc. No. 42 at 17.) But, as set forth above, extended leave is discretionary with the department head, and her department head had told Lopez her job was safe back when she had a projected return-to-work date of April 1. (*See* Lopez Dep. 128 (confirming that the last time she had a conversation with Nolen during which he told her her "job was safe" was mid-March 2023).)

The defendant has presented unrebutted proof that extending the plaintiff's uncompensated leave would have posed an undue hardship on it. For this reason, too, the County is entitled to summary judgment on the plaintiff's failure-to-accommodate claim.

### b)    *ADA Discrimination*

The plaintiff separately claims that the County violated the ADA when it terminated her because of her disability. The defendant moves for summary judgment on this claim as well, arguing that the plaintiff cannot establish a *prima facie* case of disability discrimination and that, even if she could, she cannot refute the defendant's non-discriminatory reason for the termination—that she was terminated because she did not return to work on her expected return-to-work date or properly request an extension of her leave and, even if she had, the County had no obligation to extend her leave indefinitely, with no clear prospect of a return date.

The plaintiff's argument in support of this claim is confusing, to say the least. She appears to conflate her eligibility for Temporary Disability Benefits—whether short-term or long-term—with her work status. However, the fact that she was receiving disability benefits did not guarantee her any particular length of leave.

Regardless, the plaintiff does not respond to the defendant's argument in support of summary judgment on this claim, makes no attempt to show that similarly situated employees were treated more favorably than she was, and has not tried to refute the County's proffered reason for her termination. The County is entitled to summary judgment on this claim.

### 2. TDA Claim

As the County points out, the TDA does not contain an accommodation requirement. Thus, under Tennessee law, "an employer does not violate the TDA by failing to provide a reasonable accommodation to assist an employee in performing the duties of his or her job. If a claimant needs an accommodation to be capable of performing the essential functions of the position, the claimant is not considered to be qualified for the job and may not look to the TDA for protection." *Black v. City of Clarksville*, No. M2020-01580-COA-R3-CV, 2022 WL 122615, at *5 (Tenn. Ct. App. Jan. 13, 2022) (citations omitted). In this case, there is no dispute that the plaintiff could not have returned to work on June 13 without an accommodation and, therefore, that the plaintiff's TDA claim fails.

The plaintiff does not address her TDA claim in response to the defendant's Motion for Summary Judgment, and it is clear that the claim fails as a matter of law. The County will be granted summary judgment on this claim as well.

### 3. Title VII Claim—Race/Ethnic Origin Discrimination

The County argues that Lopez's Title VII claim for race or ethnic discrimination should be dismissed for failure to exhaust and, alternatively, for lack of evidence. The court finds that the claim fails on the merits and, therefore, does not reach the defendant's argument that the plaintiff did not adequately exhaust this claim.

### a) *Legal Standards*

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

A plaintiff may prove discrimination in violation of Title VII using direct evidence or indirect evidence. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). "[D]irect evidence is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor. With direct evidence, the existence of unlawful discrimination is 'patent.'" *Weberg v. Franks*, 229 F.3d 514, 524 (6th Cir. 2000) (quoting *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996)). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Claims reliant on indirect evidence are typically analyzed under the familiar three-part "framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03 (1973)." *Redlin*, 921 F.3d at 606. At the first step of that inquiry, the plaintiff bears the "'initial burden' of 'establishing a *prima facie* case' by producing enough evidence to support an inference of discriminatory motive." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025) (quoting *McDonnell Douglas*, 411 U.S. at 802). Once the plaintiff makes out a *prima facie* case, the burden

shifts to the employer to offer a "legitimate, nondiscriminatory" reason for its actions. *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 510 (6th Cir. 2022) (citing *White v. Duke Energy-Ky., Inc.*, 603 F. App'x 442, 446 (6th Cir. 2015)); *see also Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). If it does so, the employee must then "'produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired' the employee and conclude that the proffered reason was merely a pretext for the true discriminatory motive." *Id.* (quoting *Miles v. S. Cent. Hum. Res. Agency*, 946 F.3d 883, 888 (6th Cir. 2020)).

### b) Direct Evidence

Lopez argues that she can prove discrimination based on ethnic origin using direct evidence. (Doc. No. 42 at 19.) As such "direct" evidence, she points to "ouch moments"[10] during her employment that "she believes were based on her Hispanic ethnic origin." (*Id.*) Such "ouch" moments include her supervisor's refusal to allow Lopez to use the "nice" gloves when picking up trash from around the scales, to eat cookies and other food brought to the office, to attend administrative meetings, to accept "small gratuities" offered by grateful customers, or to park near the front door, even though she allowed some of the other employees to do these things. (*Id.* (citing Lopez Dep. 36–44).)

Lopez also testified that her supervisor "had a special section of the people that she didn't like," apparently including, but not limited to, the plaintiff. (Lopez Dep. 36.) Lopez, however, did not indicate that her supervisor only disliked Hispanic people; nor did she offer any evidence that her supervisor's allegedly unfavorable treatment of her had anything to do with her ethnicity. In fact, the plaintiff testified that her supervisor was angry at her because everybody else in the office was nice and respectful toward Lopez and "went to [Lopez] and not to [the supervisor]." (*Id.* at

---

[10] This is the plaintiff's term, not the court's.

55.) In addition, her supervisor did not like her because of her political and religious beliefs. (*Id.* at 55–56.) To construe these "ouch" instances as ethnically/racially motivated would require, not merely inferences, but rank speculation.

As set forth above, direct evidence is evidence from which a factfinder is not required to "draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson*, 319 F.3d at 865. The plaintiff has proffered no such evidence in this case.

### c) Indirect Evidence

Lacking direct evidence of unlawful discrimination, the plaintiff may attempt to prove her Title VII claim using indirect evidence. The County argues that the plaintiff cannot establish a *prima facie* case of discrimination and that, even if she could, she cannot show that the County's legitimate, nondiscriminatory reason for the termination was pretextual.

### *Prima Facie* Case

Typically, to make out such a *prima facie* case of race discrimination, the plaintiff must show that she (1) is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment decision; and (4) she was either replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 510 (6th Cir. 2022) (citation omitted).[11]

There is no evidence in the record regarding who replaced the plaintiff. The plaintiff asserts instead that similarly situated, non-protected employees were treated more favorably than she was. The County argues that the plaintiff's proposed comparators are not similarly situated to her in all

---

[11] It is unclear to what extent the first element of the *prima facie* case or, indeed, any reference to "protected class," remains relevant after the Supreme Court's decision in *Ames*.

relevant respects. The County also asserts that Lopez was not qualified for her job at the time she was terminated, as it is undisputed that she was not actually able to work as of the date of her termination.

The plaintiff identifies four employees who, she claims, were "out more than six months" and a fifth who was on "extended leave" due to "knee issues." (Doc. No. 42 at 21–22 (citing Lopez Dep. 212–14).) Lopez claims that she knew how long these individuals were on leave because "process[ing] their paperwork [w]as part of her job duties." (*Id.* at 22 (citing Lopez Dep. 214–15).) She identifies these employees as Danny Wise, Danny Lampland, Tommy King, Robert Harrison, and Jennifer Stanley.[12] (*Id.* at 21–22.)

Regarding Danny Wise, the plaintiff testified that he was off "a lot, in and out, in and out of surgery," but she did not know if his total time off exceeded 480 hours because she "didn't keep track of the hours." (Lopez Dep. 212–13.) Regarding Danny Lampland, the plaintiff claims that she was "pretty sure" he was out more than 480 hours because she was "pretty sure" he was out for more than six months and "way longer" than she was. (*Id.* at 213.)

Tommy King, she claims, was "back and forth for therapy for the leg" and that she "believed" his leave exceeded 480 hours because "he said he had a lot of hours." (*Id.*) Robert Harrison was also out for "[a] lot of pain on the knees," but Lopez did not indicate for how long, and she did not know whether his or any of the other employees' leave was related to workers' compensation. (*Id.* at 213–14.) Jennifer Stanley was out a "long time" when her father passed away, but Lopez did not know whether it was for more than six months. (*Id.* at 214.)

---

[12] The County identifies these employees by initials only.

The plaintiff could not say whether any individual was out for a longer period of leave than she was after Clair Cochran became HR Director because she "didn't even know" when Cochran moved into that position. (*Id.* at 214.)

The court finds that the plaintiff's vague and unsubstantiated recollection regarding the length of leave time the purported comparator employees took off is not sufficient to create a material factual dispute regarding the actual length of their leave. *Accord Marsh v. E. Associated Ests. Realty*, 521 F. App'x 460, 468 (6th Cir. 2013) ("In the face of [the defendant's concrete] evidence, [the plaintiff's] unfounded speculation, supported by no concrete proof, does not raise a genuine dispute of material fact."). Here, the County has offered concrete evidence "collected from the County's records, such records having been prepared at or near the time of the matters reflected in them, by a person with a business duty to prepare them accurately, in the regular course of County business" (Cochran Aff. ¶ 12) that:

- Danny Wise (identified as D.W.) was a truck driver who took medical leave for less than six weeks, from May 17, 2022 to June 23, 2022 (*id.* ¶ 13);

- Danny Lampland (or D.L.) was a heavy equipment operator who took twelve weeks (480 hours) of FMLA leave from September 9, 2020 to December 1, 2020 and then extended, non-FMLA leave from December 2 to December 9, 2020 (40 hours), after which he "left his employment with the County on December 18, 2020 (*id.* ¶ 14);

- Tommy King (or T.K.), Operations Manager took a medical leave of absence made available by the County during the COVID pandemic from August 17–31, 2020 but took no other medical or personal leave of absence since the plaintiff began working for the County in 2019 (*id.* ¶ 15);

- Robert Harrison (or R.H.), a heavy equipment operator, has not taken any FMLA leave or special or extended leave of any kind since the plaintiff began working for the County (*id.* ¶ 16); and

- Jennifer Stanley, a Recycling Specialist, took intermittent leave to care for her sick father between February 24, 2020 and March 31, 2020 (*id.* ¶ 17).

Cochran adds that "[a]ny time off that Plaintiff noted" for King or Harrison was "time off accrued pursuant to Williamson County employee sick and vacation leave policies." (*Id.* ¶¶ 15–16.)

Cochran also testified that she became HR Director for the County beginning in January 2023, following her predecessor's retirement, and that, during her tenure, "employees have not been approved for additional leave beyond six months of continuous leave unless there is a clear indication of an imminent return to work." (*Id.* ¶ 7.)

Under Sixth Circuit law, to establish that she was treated differently than similarly situated employees, Lopez must show that she and her proposed comparators were similar in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). In every case, the court must make an "independent determination" of what factors are relevant, and that determination depends on whether certain factors "are meaningful to the particular claim of discrimination presented." *Rembert v. Swagelok Co.*, No. 22-3554, 2023 WL 3094546, at *7 (6th Cir. Apr. 26, 2023) (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *see also Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (explaining the necessity of independently determining factors relevant to this inquiry).

The most relevant factor here is the length of leave. Of the plaintiff's comparators, only one comes close to having taken the amount of leave the plaintiff took: Danny Lampland took the full amount of FMLA leave available to him and then took another 40 hours of leave. However, he also left his employment just over a week after the end of his extended leave. The record does not reveal why he left his employment, but it is clear that he did not request five months of extended leave after his FMLA leave expired. None of the other proposed comparators took extended leave at all, and the plaintiff's speculation that they did and as to the length of that leave simply is not sufficient to allow her to avoid summary judgment.

In other words, the plaintiff cannot show that she was treated differently from any similarly situated employees and, as a result, cannot establish a *prima facie* case of discrimination. On this basis alone, the County is entitled to summary judgment on the plaintiff's Title VII claim. In addition, for the same reasons discussed in connection with the plaintiff's ADA claims, even if the plaintiff could establish a *prima facie* case of ethnicity/race discrimination, she cannot show that the County's proffered reason for her termination was pretext for unlawful discrimination.

### 4. *Breach of Contract / Promissory Estoppel*

The plaintiff's breach of contract and promissory estoppel claims are premised, first, upon the May 24, 2023 letter she received from Patti Hawkins with the County's Benefits Department. As also set forth above, that letter stated in relevant part:

> Your leave period under the Williamson County Government Temporary Disability Program began on December 10, 2022. The current physician statement indicates your return to work date will be June 12, 2023.

> Please be advised that since you exhausted your FMLA leave on March 26, 2023 and your Temporary Disability Program [wil]l end on June 10, 2023, you will be on uncompensated leave. For this reason you will be offered continuation of benefits through COBRA as of June 11, 2023.

(Doc. No. 33-5 at 27.) In addition, the plaintiff claims that Mac Nolen told her during a department Christmas party on December 10, 2022 that her "job was safe and would be held for [her] while [she] recovered from [her] surgery on December 10, 2022." (Lopez Aff. ¶ 2.) Nolen allegedly repeated to the plaintiff shortly after another medical procedure in early March 2023 that her "job was safe and would be held for [her] while [she] recovered." (*Id.* ¶ 4.)

According to Lopez, when she received the May 24 letter, she already believed, based on Nolen's statements, that Nolen "was holding [her] job for [her] by providing uncompensated leave until [her] medical situation allowed [her] to return." (*Id.* ¶ 6.) The plaintiff "relied on this letter," believing her job was "safe while [she] recovered." (*Id.* ¶ 7.)

Lopez characterizes the May 24 letter as providing notice that she was "entering into unpaid leave status after June 10, 2023" and as "acknowledg[ing] that Ms. Lopez requested and continue[d] to need medical leave, and . . . affirmatively stat[ing] that she will enter uncompensated leave to recover from her medical issues." (Doc. No. 27 at 3.) Lopez asserts that "[t]his is the type of employer promise on which the employee can reasonably rely" and that the letter establishes an implied in fact contract in providing uncompensated leave for medical recovery." (*Id.*) Alternatively, she argues that Nolen's promises coupled with the May 24 letter give rise to a promissory estoppel claim.[13]

### a) Legal Standards

In Tennessee, the "employment-at-will doctrine" applies to any employment relationship not "formalized by a contract for a definite term." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 403 (Tenn. Ct. App. 2007). Under the employment-at-will doctrine, employers and employees are "generally permitted, with certain exceptions, to terminate the employment relationship at any time for good cause, bad cause, or no cause." *Id.* (quoting *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)). Accordingly, "in Tennessee, unless there is a contract of employment for a definite term, a discharged employee may not recover against an employer because there is no right to continued employment." *Cantrell v. Knox Cnty. Bd. of Educ.*, 53 S.W.3d 659, 662 (Tenn. 2001) (citing *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994)).

"The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Bynum v. Sampson*, 605 S.W.3d 173, 180 (Tenn. Ct. App.

---

[13] The Complaint does not include a promissory estoppel claim.

2020) (quoting *ARC Lifemed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). In the employment context, it is presumed that an employee is employed on an "at will" basis, and that presumption can only be overcome by specific language guaranteeing the employee a definite term of employment. *Koch v. Lightning Transp., LLC*, No. 3:13-0225, 2015 WL 66971, at *6 (M.D. Tenn. Jan. 6, 2015) (Sharp, J.) (citations omitted).

Promissory estoppel, also known as "detrimental reliance," is an equitable remedy the application of which is limited to "exceptional cases." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007). Under the doctrine of promissory estoppel, "'a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Id.* at 404 (quoting *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982)). To prove promissory estoppel, the plaintiff must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that [she] reasonably relied upon the promise to [her] detriment." *Id.* (citing *Rice v. NN, Inc. Ball & Roller Div.*, 210 S.W.3d 536, 544 (Tenn. Ct. App. 2006)). "The key element in finding promissory estoppel is, of course, the promise." *Id.* at 405 (quoting *Amacher v. Brown–Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991)).

### b)     Application

The plaintiff's breach of contract claim fails, because she cannot establish the first necessary element of the claim: the existence of an enforceable contract promising employment for a definite term. Contrary to Lopez's assertions, in fact, the May 24 letter did not promise employment at all. It noted that Lopez, as of the date of the letter, was expected to return to work on June 12, 2023, per her physician's most recent statement. (Doc. No. 33-5 at 27.) It then advised Lopez that her Temporary Disability Program was scheduled to end on June 10, 2023, meaning

only that there would be a gap between June 10 and her anticipated return to work on June 12 (or June 13), during which the plaintiff would not receive any disability payments and, therefore, would be on "uncompensated leave." The letter also offered COBRA benefits beginning June 11, presumably because the plaintiff's employer-sponsored health insurance benefits would be ending. This letter does not refer to or promise employment for any length of time, and particularly not for a definite term. Accordingly, even if it could be construed as promising employment (in the form of uncompensated leave) beginning on June 10, it did not promise employment for a definite term and, therefore, cannot overcome the presumption that no contract of employment was created.

Likewise, Nolen's purported promises that the plaintiff's job was "safe" while she recovered from surgery did not promise employment for a definite term. In the absence of a contract for a definite term, the plaintiff remained at all times an at-will employee, and her employment could be terminated at any time.

The plaintiff's reliance on *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487 (Tenn. Ct. App. 2003), is misplaced. *Vargo* simply held that employee manuals can, under certain circumstances, create enforceable contracts and that the particular promise that "[s]everance payments will be paid" to eligible employees created an enforceable contract in that case. *Vargo*, 115 S.W.3d at 492. Based on *Vargo*, the plaintiff argues that the use of "will" in the May 24 letter ("you will be on uncompensated leave") created a contract. If, indeed, that sentence can be construed as a "promise," the employer did not breach it, because the plaintiff did, in fact, go on uncompensated leave on June 10, until her termination on June 13. Because the letter did not promise employment for a definite term, the plaintiff's termination did not constitute breach of a contract. *Accord Sudberry v. Royal & Sun Alliance*, 344 S.W.3d 904, 914 (Tenn. Ct. App. 2008) ("Tennessee has long recognized that statements by an employer about the prospect of long-term

employment are not contractually binding, nor do same alter the at-will presumption." (citations omitted)).

In short, the defendant is entitled to summary judgment on the plaintiff's breach of contract claim. Likely anticipating that result, the plaintiff also argues that the May 24 letter, combined with Nolen's statements, gives rise to a promissory estoppel claim. This claim fails as well.

As set forth above, the "key element in finding promissory estoppel is . . . the promise." *Chavez*, 245 S.W.3d at 405. To be enforceable, the promise must be unambiguous. In this case, Nolen's alleged "promises" in December 2022 and March 2023 that the plaintiff's job was "safe and would be held for her while [she] recovered from surgery" (Lopez Aff. ¶¶ 2, 4) did not constitute unqualified, unambiguous promises that the plaintiff's job would be held open indefinitely. As the County points out, when Nolen allegedly made the first such statement in December, the plaintiff anticipated returning to work within a couple of months. In March, when he allegedly repeated the "promise," the plaintiff had an April 1 return-to-work date. In any event, because the plaintiff cannot establish a definite, unambiguous promise that is not unenforceably vague, her promissory estoppel claim based on Nolen's statements fails. *Accord Atwood v. JCF Residences Mgmt. Co.*, No. 1:20-cv-00056, 2022 WL 185187, at *9 (M.D. Tenn. Jan. 19, 2022) (Campbell, J.) (finding that a "discharged employee generally cannot recover from an employer for breach of contract or promissory estoppel based on termination of employment because there is no right to continued employment"); *Koch*, 2015 WL 66971, at * 7, *9 (dismissing claims for breach of contract and promissory estoppel because, under the at-will-employment doctrine, defendants were entitled to terminate, decline to rehire, or not allow plaintiff to return to work following maternity leave despite their promise to the contrary).

Likewise, the May 24 letter does not contain an unambiguous promise. As discussed above, the obvious purpose of the letter was to inform the plaintiff of the date her disability payments would terminate and to offer her COBRA coverage. The letter refers to uncompensated leave beginning June 10, 2023, but it did not promise that such leave would extend for any particular period of time. Accordingly, because the plaintiff was an at-will employee, even if the letter could be construed as a promise, it promised nothing other than that, as of June 11, 2023, the plaintiff would be on uncompensated leave. The termination of her employment on June 13, 2023 did not violate that purported "promise." Thus, even if the court accepts as true the plaintiff's allegation that she relied on the letter to her detriment, such purported reliance is immaterial, both because the letter did not make any unambiguous promise of employment for a definite term and because, in the absence of an unambiguous promise, such reliance was unreasonable.

The defendant is entitled to summary judgment on the issue of promissory estoppel.

## III.    THE PLAINTIFF'S MOTION

Because the defendant is entitled to summary judgment in its favor on the plaintiff's breach of contract claim, the plaintiff's Motion for Partial Summary Judgment on the same issue will be denied without discussion.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 29) will be granted in its entirety, and the plaintiff's Motion for Partial Summary Judgment (Doc. No. 26) will be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge